ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
Earthjustice
707 Wilshire Street, Suite 4300
Los Angeles, CA 90017
Tel: (213) 766-1067 / Fax: (415) 217-2040

MICHELLE GHAFAR (CA Bar No. 315842)
mghafar@earthjustice.org
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for National Parks Conservation
Association, Natural Resources Defense Council,
and The Wilderness Society*

(List of Counsel continued on next page)

## UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
#### WESTERN DIVISION

CENTER FOR BIOLOGICAL DIVERSITY,
CENTRAL CALIFORNIA ENVIRONMENTAL
JUSTICE NETWORK, LOS PADRES
FORESTWATCH, NATIONAL PARKS
CONSERVATION ASSOCIATION, NATURAL
RESOURCES DEFENSE COUNCIL,
PATAGONIA WORKS, SIERRA CLUB, and THE
WILDERNESS SOCIETY,

    Plaintiffs,

  v.

U.S. BUREAU OF LAND MANAGEMENT;
DAVID BERNHARDT, in his capacity as
Secretary of the U.S. Department of the Interior;
KAREN MOURITSEN, in her capacity as
California State Director of the U.S. Bureau of
Land Management,

    Defendants.

) Civ. No.
)
)
)
)
)
) **COMPLAINT FOR**
) **DECLARATORY AND**
) **INJUNCTIVE RELIEF**
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

BRENDAN CUMMINGS (CA Bar No. 193952)
bcummings@biologicaldiversity.org
CLARE LAKEWOOD (CA Bar No. 298479)
clakewood@biologicaldiversity.org
Center for Biological Diversity
1212 Broadway, Suite 800
Oakland, CA 94612
Tel: (510) 844-7121 / Fax: (510) 844-7150

*Counsel for Center for Biological Diversity, Central
California Environmental Justice Network, Los
Padres ForestWatch, Patagonia Works, and Sierra
Club*

Complaint for Declaratory and Injunctive Relief

**INTRODUCTION**

1. Plaintiffs Center for Biological Diversity, Central California Environmental Justice Network, Los Padres ForestWatch, National Parks Conservation Association, Natural Resources Defense Council, Patagonia Works, Sierra Club, and The Wilderness Society (collectively "Plaintiffs") challenge the final supplemental environmental impact statement ("SEIS") adopted by the Bakersfield Field Office of the U.S. Bureau of Land Management ("BLM") on December 12, 2019. The SEIS fails to adequately analyze the serious environmental and health impacts from hydraulic fracturing (or "fracking") on more than a million acres of federal land and mineral estate that BLM has opened to harmful oil and gas leasing and development, in violation of the National Environmental Policy Act ("NEPA"). Because BLM approved the SEIS in violation of federal environmental laws, this Court has jurisdiction under 28 U.S.C. § 1331.

2. The SEIS at issue in this case supports a resource management plan ("RMP") adopted by the Bakersfield Field Office in 2014 (hereafter "2014 RMP") for a planning area encompassing 400,000 acres of federal land and 1.2 million acres of federal mineral estate across eight counties in California's southern Central Coast and Central Valley region. The 2014 RMP opened over 1 million acres of this surface land and mineral estate to extensive oil and gas leasing and development, including through use of dangerous and polluting fracking technologies.

3. Conventional oil and gas extraction has already degraded air quality in the region, contributed to global climate change, and threatened public lands as well as the health and safety of nearby communities already overburdened by pollution.

4. Unconventional extraction techniques like fracking have worsened these impacts, and raised new concerns. Fracking has made previously inaccessible oil reserves easier to reach, and thus perpetuates oil activities in areas that have already been drilled, while further facilitating drilling in undeveloped areas. In addition, fracking exacerbates air pollution in areas of the state that already have some of the

Complaint for Declaratory and Injunctive Relief

worst air quality in the nation. For example, the San Joaquin Valley region of Kern County, one of the areas where BLM has authorized increased oil and gas drilling, is consistently designated as extreme nonattainment for federal air pollution standards. And fracking entails greater use of toxic chemicals that can contaminate usable water and enter the air during the venting of gases or the evaporation of chemicals from fracking and produced fluids, leading to dangerous human exposures. Fracking thus endangers the health and safety of the many communities that live and work in the area, and that are already overburdened by poor air quality.

5.     Fracking also exacerbates serious air pollution and air quality impacts on public lands, including areas granted special federal air quality protections such as Sequoia and Kings Canyon National Parks. Pollution associated with fracking threatens to worsen already degraded visibility and violate federal air pollution standards in these public lands, jeopardizing their ecosystems and visitor health.

6.     Though BLM prepared a final environmental impact statement ("FEIS") in 2012 to support the 2014 RMP, the FEIS failed to analyze the impacts of fracking on the diverse and already vulnerable public resources in central California, including air quality, water, and wildlife. In 2016, Plaintiffs Center for Biological Diversity and Los Padres ForestWatch successfully challenged the 2014 RMP and accompanying FEIS. This Court ultimately held that BLM failed to comply with NEPA, because it failed to adequately analyze the environmental impacts of fracking in the 2014 RMP. Consequently, BLM agreed not to conduct any new oil and gas lease sales within the Bakersfield Field Office planning area until it completed supplemental NEPA analysis to address the deficiencies identified by the Court.

7.     In an effort to remedy its NEPA violation, BLM prepared and adopted the SEIS at issue in this case. Yet the SEIS still fails to confront the significant impacts of fracking. The SEIS unlawfully minimizes the number of wells predicted to be fracked on new leases, and fails to adequately analyze the impacts of fracked wells on existing leases, leading to an underestimation of the impacts to air quality, climate,

Complaint for Declaratory and Injunctive Relief

water quantity and quality, human health and safety, recreational uses, national park units and other public lands, and seismicity. It also fails entirely to evaluate the health effects of fracking on local communities.

8.      BLM's continuing failure to take the requisite "hard look" at the environmental impacts associated with fracking violates NEPA. Plaintiffs therefore ask this Court to set aside the SEIS, require BLM to take a proper hard look at the environmental impacts of fracking, and enjoin BLM from carrying out oil and gas leasing under the 2014 RMP pending compliance with NEPA.

## JURISDICTION AND VENUE

9.      This action arises under NEPA, 42 U.S.C. §§ 4321-4370m-12, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1787, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, which waives the Defendants' sovereign immunity. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

10.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant). An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

11.      Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e)(1), because Plaintiffs Los Padres ForestWatch and Patagonia Works reside in this district and a substantial part of the federal land that is the subject of this action lies in this district.

12.      Assignment to the Western Division of this district court is proper, because Plaintiff Los Padres ForestWatch resides in Santa Barbara County, and Patagonia Works' corporate headquarters is located in Ventura County.

## PARTIES

13.      Plaintiff Center for Biological Diversity ("the Center") is a nonprofit organization with offices throughout the United States, including in Oakland and Los Angeles, California. The Center works through science, law, and policy to advocate

for increased protections for California species and their habitats, a livable climate, and healthy communities by engaging at every step of federal fossil fuel planning, leasing, and development. The Center has over 67,000 members throughout the United States and the world, including those living in California and who live near and who visit the public lands affected by the SEIS. The Center brings this action on its own behalf and on behalf of its adversely affected members.

14.     Plaintiff Central California Environmental Justice Network ("CCEJN") is an unincorporated association of twenty-six grassroots environmental justice groups and individuals with the mission to preserve our natural resources by seeking to minimize or eliminate environmental degradation in San Joaquin Valley communities. CCEJN supports grassroots leadership to promote environmental health education, community organizing, and dialogue among rural, underserved communities of color in the San Joaquin Valley. CCEJN actively works to educate Kern County residents about the impacts of fracking; to improve County residents' ability to identify and monitor oil and gas-related pollution, including by collecting information about potential community health threats by documenting toxic air pollution from oil and gas development sites in the San Joaquin Valley; and to advocate for systemic change that prioritizes the health of fenceline communities. CCEJN brings this action on its own behalf and on behalf of its adversely affected members.

15.     Plaintiff Los Padres ForestWatch is a community-based nonprofit organization with more than 23,000 members and online supporters, headquartered in Santa Barbara, California. The organization's mission is to protect the Los Padres National Forest, the Carrizo Plain National Monument, and other public lands along California's central coast, including certain lands administered by BLM's Bakersfield Field Office. Los Padres ForestWatch brings this action on its own behalf and on behalf of its adversely affected members.

16.     Plaintiff National Parks Conservation Association ("NPCA") is a non-partisan, nonprofit organization that works to conserve and enhance America's

Complaint for Declaratory and Injunctive Relief

national parks, monuments, and other public lands for current and future generations. Founded in 1919, NPCA is the only membership organization in the United States focused solely on protection of the National Park System. NPCA has over 1.4 million members and supporters, including those living in California, plus numerous other members who visit the iconic national parks and monuments near the planning area, including Yosemite, Sequoia and Kings Canyon National Parks; César E. Chávez and Carrizo Plain National Monuments; and other federally protected lands potentially affected by BLM's action, including the Santa Monica Mountains National Recreation Area and Giant Sequoia National Monument. NPCA files this action on behalf of its members who will be adversely affected by the SEIS.

17.    Plaintiff Natural Resources Defense Council ("NRDC") is a nonprofit environmental membership organization that uses law, science, and the support of more than 375,000 members throughout the United States to protect wildlife and wild places and to ensure a safe and healthy environment for all living things. Over 66,000 of NRDC's members reside in California, with more than 200 of those residing in Kern County. NRDC has a long-established history of working to protect public lands, ensure proper oversight of oil and gas production activities, reduce the environmental harm associated with fracking, and address climate change by promoting clean energy and reducing America's reliance on fossil fuels. NRDC members who live in or near the planning area will be adversely impacted by new fracking development, as will those who recreate in affected areas.

18.    Plaintiff Patagonia Works ("Patagonia") is a private, closely held, outdoor apparel company with its headquarters in Ventura, California where 750 of its employees and their families live and recreate, in and around the planning area that will be negatively impacted by new fracking. Patagonia has a 40-year history of environmental activism and has funded more than $100 million in grants to thousands of grassroots environmental organizations. Protecting and preserving the environment is a core business tenet and, in 2012, Patagonia became a California benefit

corporation, enshrining its blended goals of business and environmental conservation into its Articles of Incorporation. Cal. Corp. Code §§ 14600-14631. Patagonia's mission statement is "We're in business to save our home planet." Patagonia also has a business interest in protecting and preserving the natural environment because the outdoor recreation industry depends on a healthy and sustainable environment in which customers can recreate, including the opportunity to see wild places in their native conditions.

19. Plaintiff Sierra Club is a national nonprofit organization with sixty-three chapters and more than 778,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's Kern-Kaweah Chapter has approximately 800 members in Kern County. The Sierra Club has been actively working in California, including in Kern County, to address the serious threats to public health and the environment posed by the lack of oversight and safeguards for oil and gas drilling activities, including fracking.

20. Plaintiff The Wilderness Society ("TWS") has a mission to protect wilderness and inspire Americans to care for our wild places. TWS is one of America's leading public lands conservation organizations. Since 1935, TWS has been dedicated to protecting America's wild places for current and future generations. TWS contributes to better protection, stewardship, and restoration of public lands, preserving the nation's rich natural legacy for current and future generations. TWS is committed to smart and sensible regulation and management of our public lands and ensuring that our public lands are part of the solution to climate change. TWS engages frequently in BLM land use planning and project proposals, including the SEIS at issue. TWS has offices throughout the country, including in Oakland, California and in Pasadena, California. TWS has 25,626 members in California, and over one million

Complaint for Declaratory and Injunctive Relief

members and supporters nationwide. TWS members and staff have visited and recreated in the public lands within the Bakersfield planning area.

21.     Plaintiffs have many members, owners, employees, and customers who live, work, and recreate in and around the federal land at issue in this case who are and will be adversely affected by BLM's decision to adopt the SEIS.

22.     Plaintiffs' boards, staff, members, owners, employees, and customers use the federal property that is subject to the SEIS and 2014 RMP for recreation, scientific research, aesthetic pursuits, and spiritual renewal. Plaintiffs' boards, staff, members, owners, employees, and customers intend to continue to use and enjoy the surface lands overlying the federal mineral estate that is subject to the SEIS and 2014 RMP, as well as other land in the Bakersfield planning area frequently and on an ongoing basis in the future.

23.     Plaintiffs' boards, staff, members, owners, employees, and customers are harmed by BLM's decision to adopt the SEIS. By improperly minimizing the number of wells predicted to be fracked, the SEIS underestimates the significant health and environmental impacts of fracking. For example, fracking on federal land and mineral estate in the Bakersfield planning area will degrade air quality and precious water resources used by Plaintiffs' boards, staff, members, owners, employees, and customers. New fracked wells will also allow increased oil and gas production, resulting in noise, visual blight, increased traffic, seismic risks, and air pollution, including increased emission of pollutants responsible for climate change. All of these harms will diminish Plaintiffs' ability to enjoy the recreational, spiritual, professional, aesthetic, educational, and other activities in and around the lands subject to the SEIS and 2014 RMP.

24.     Additionally, Plaintiffs and their respective boards, staff, members, owners, employees, and customers have a substantial interest in ensuring that BLM complies with all applicable laws, including the procedural requirements of NEPA. Plaintiffs Center for Biological Diversity and Los Padres ForestWatch extensively

participated in BLM's decisionmaking around the 2014 RMP and accompanying FEIS, and all Plaintiffs participated in BLM's decisionmaking around the SEIS, including by submitting comments on the draft SEIS.

25.    Plaintiffs' injuries are actual and concrete and would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law. Plaintiffs have exhausted all available administrative remedies.

26.    Defendant United States Bureau of Land Management is an administrative agency within the United States Department of the Interior responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands across the United States, including the land and mineral estate that is subject to the SEIS and 2014 RMP.

27.    Defendant David Bernhardt is sued in his official capacity as the Secretary of the United States Department of the Interior. As Secretary, Mr. Bernhardt is the official ultimately responsible for managing federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

28.    Defendant Karen Mouritsen is sued in her official capacity as the State Director of BLM in California. As State Director, Ms. Mouritsen is the official ultimately responsible for managing California's federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

## STATUTORY BACKGROUND

### I.    Federal Land Policy and Management Act

29.    The Federal Land Policy and Management Act of 1976 governs the management, protection, development, and enhancement of federal property under BLM's jurisdiction. FLPMA provides that land managed by BLM "be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that,

where appropriate, will preserve and protect certain public lands in their natural condition; . . . and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

30.    At its core, FLPMA requires BLM to prepare, with public involvement, a "resource management plan" for the public lands in its jurisdiction. 43 U.S.C. § 1712(a). Such plans are expected to provide policy, guidance, and standards for all site-specific activities that occur on the land in question, effectively outlining BLM's approach to future management decisions over the next ten to fifteen years.

31.    In developing a resource management plan, BLM must, among other things, "consider present and potential uses of the public lands; . . . consider the relative scarcity of the values involved[;] . . . weigh long-term benefits to the public against short-term benefits; [and] provide for compliance with applicable pollution control laws." 43 U.S.C. § 1712(c). "All future resource management authorizations and actions" by BLM, as well as "subsequent more detailed or specific planning" must conform to approved resource management plans. 43 C.F.R. § 1610.5-3(a).

32.    BLM has determined that preparation of a resource management plan "is considered a major Federal action significantly affecting the quality of the human environment," and therefore requires the preparation of an environmental impact statement under NEPA. 43 C.F.R. § 1601.0-6.

## II.    National Environmental Policy Act

33.    NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

34.    NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare of" all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321. NEPA recognizes that "each person should enjoy a healthful environment" and requires that the federal government uses all practicable means to "assure for all Americans safe, healthful, productive, and esthetically and

culturally pleasing surroundings," and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." *Id.* § 4331(b)-(c).

35.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Service*, 137 F.3d 1372, 1380 (9th Cir. 1998). Furthermore, the "'hard look' 'must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made.'" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011).

36.     NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

37.     The EIS must, among other things, describe the "environmental impact of the proposed action," and evaluate "alternatives to the proposed action." 42 U.S.C. § 4332(C)(i), (iii).

38.     All environmental analyses required by NEPA must be conducted at "the earliest possible time." 40 C.F.R. § 1501.2; *see also Kern v. U.S. Bureau of Land Mgmt.,* 284 F.3d 1062, 1072 (9th Cir. 2002) ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done.").

39.     Federal agencies must prepare a supplemental EIS whenever they are presented with "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). An SEIS must similarly take a "hard look" at the environmental impacts of proposed agency actions. *Oregon Natural Res. Council v. Lowe*, 109 F.3d 521, 528 (9th Cir. 1997).

40.     NEPA requires federal agencies to "assess and consider" public comments "both individually and collectively" and to properly respond to those comments in a final EIS. 40 C.F.R. § 1503.4(a). In its responses to comments, an agency must: (1) "[m]odify alternatives including the proposed action"; (2) "[d]evelop and evaluate alternatives not previously given serious consideration by the agency"; (3) "[s]upplement, improve, or modify its analyses"; (4) "[m]ake factual corrections"; or (5) "[e]xplain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response." *Id.* § 1503.4(a)(1)-(5).

## III.   Administrative Procedure Act

41.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id.* § 704.

42.     Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2), (2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." *Id.* § 706(2)(B)-(F); *see id.* § 706(2)(B)-(F).

# FACTUAL BACKGROUND

## I.    The Bakersfield Field Office Planning Area

43.    BLM's Bakersfield Field Office administers federal land and mineral estate within the Bakersfield Field Office's "planning area"—an administrative geographic jurisdiction of approximately 17 million acres of land stretching from the coastal islands in the Pacific Ocean across the Central Valley to the crest of the Sierra Nevada Range. Federal land and mineral estate under the Bakersfield Field Office's jurisdiction falls within Kings, San Luis Obispo, Santa Barbara, Tulare, Ventura, Madera, eastern Fresno, and western Kern Counties.

44.    Within the Bakersfield planning area, BLM administers a "decision area" of approximately 400,000 acres of public land and 1.2 million acres of subsurface mineral estate at issue in the SEIS and 2014 RMP. This property ranges in character from coastal areas, including coastal urban areas near Los Padres National Forest, to dry expanses in the San Joaquin Valley, to rugged hills in the Sierra bioregion.

45.    The federal property subject to the SEIS and 2014 RMP is also at the epicenter of oil and gas drilling, including fracking, in California. California is one of the top oil producing states in the United States, with much of this production occurring in Kern County, the San Joaquin Valley, and Ventura County in the planning area, including on land or mineral estate overseen by the Bakersfield Field Office. Several of the largest oil fields in the country are located in Kern County.

46.    Fracking and other unconventional well stimulation activities are concentrated in the same areas of California as conventional oil and gas drilling. The oil and gas industry has employed fracking with increasing frequency in California in recent years. Approximately 28 percent of wells on federal land or mineral estate in the planning area are fracked. BLM has estimated about 90 percent of new wells drilled on federal land are fracked.

47.    As in most of California, water scarcity is an ever-present concern in the planning area. Groundwater is essential to agriculture and other sectors of the

Complaint for Declaratory and Injunctive Relief

economy, and provides about 75 percent of California's population with at least some drinking water. Groundwater quality throughout the planning area is generally suitable for most urban and agricultural uses, and is valuable for that reason. Due to historic, multiyear drought conditions and surface water scarcity in California, reliance on groundwater has increased, consequently reducing groundwater availability. Groundwater overdraft is expected to continue into the future. Fracking, which will occur in close proximity to protected groundwater, poses a serious risk of contamination of already scarce supplies of usable water.

48.    Residents in the planning area suffer from serious air quality problems. Oil and gas facilities in the San Joaquin Valley emit significant air pollution, including 30 percent of all sulfur oxides, 70 percent of hydrogen sulfide, and 8 percent of anthropogenic volatile organic compounds ("VOCs"), which in turn react with nitrogen oxides ("NOx") to create ozone. The San Joaquin Valley, which is one of the largest oil and gas-producing regions in California, has some of the nation's worst air quality and is classified as an "extreme" nonattainment area for ozone and a "serious" nonattainment area for fine particulate matter standards.

49.    The national park units and wilderness areas in and around the planning area also experience significant air quality problems. Ozone risks to human and vegetative health, visibility, and wet nitrogen deposition all "warrant significant concern," according to the National Park Service, at Sequoia and Kings Canyon National Parks. These park units and others in the region are already at risk for vegetative and ecosystem damage from current levels of air pollutants. High levels of ozone harm the health of park visitors, while air pollution seriously reduces visibility, reducing the average natural visual range from about 150 miles to about 65 miles, and to below 30 miles on high pollution days. The national park units and wilderness areas in and around the planning area, including Sequoia, Kings Canyon, and Yosemite National Parks as well as Ansel Adams Wilderness, Kaiser Wilderness, John Muir

Wilderness, Domeland Wilderness, and San Rafael Wilderness, are granted special federal air quality protections to address air pollution.

50.     The planning area is also seismically active, with numerous earthquake faults running through the region. Because faults can either trap crude oil, or act as a conduit, oil fields are frequently located in the vicinity of faults.

**II.     The Impacts of Fracking**

51.     Fracking is an unconventional oil and gas drilling technique whereby hydraulic fracturing fluid—a mix of water, sand, and toxic chemicals—is injected down an oil or gas production well under pressure great enough to fracture the surrounding oil- or gas-bearing rock formation. After fracturing, oil, gas, and other fluids flow through the fractures and up the production well to the surface for collection.

52.     Fracking on public lands produces air pollution emissions including nitrogen oxides, sulfur dioxide, particulate matter, volatile organic compounds, and hazardous air pollutants.

53.     Fracking, and the fossil fuels produced as a result, also generate emissions of greenhouse gases, such as carbon dioxide and methane, that cause global warming and climate change. Oilfields in the Bakersfield planning area, which include federal land and mineral estate, produce some of the most carbon-intensive, or climate-damaging, crude oil in California.

54.     The toxic chemicals known to be used in the fracking process are associated with particularly adverse human health impacts, including asthma, reproductive system problems, and cancer. Human health impacts associated with fracking also result from the subsequent release of additional toxic chemicals and naturally occurring radioactive materials during well production.

55.     Fracking fluid flowback—the waste fluid pumped out of the well and separated from oil and gas immediately following a fracking operation—not only may contain the chemical additives used in the drilling process, but may also contain heavy

metals, naturally occurring radioactive materials, and other toxic substances, such as benzene. These substances may also occur in produced water—waste fluid that is produced from a fracked oil or gas well for the life of the well, and which must be separated and disposed.

56.    Numerous pathways exist for the release of these toxic fluids from a fracked well. Fluids can migrate through underlying faults to contaminate underground sources of drinking water. Disposal of waste fluids in unlined pits can contaminate groundwater supplies and water supply wells and emit numerous harmful air pollutants. Spills and leaks also affect surface water resources. In addition, fracking results in emissions of hazardous air pollutants that can enter the air during the venting of gases or the evaporation of chemicals from fracking and produced fluids, leading to dangerous human exposures from venting or fugitive losses.

57.    Increased fracking and the necessary disposal of fracking waste fluid may increase the risk of earthquake activity and larger quakes. Higher volumes and pressures of fluid injection due to fracking can increase the risks of induced seismicity. Multiple fracking operations that are close in time and space can further increase seismic risks.

58.    Due to the foregoing impacts associated with fracking, the presence of fracking in a given area adversely affects recreational, spiritual, professional, aesthetic, educational, and other activities in and around the lands affected.

## PROCEDURAL BACKGROUND

59.    On December 22, 2014, BLM finalized the Bakersfield Field Office's RMP and accompanying FEIS.

60.    In an effort to estimate the environmental impacts associated with oil and gas extraction under the 2014 RMP, BLM's FEIS relied on a "reasonably foreseeable development scenario" that projected anticipated future oil and gas production in the area. According to BLM's projection, between 100 and 400 new wells will be drilled in the decision area per year over the next ten years, though the FEIS never explained

Complaint for Declaratory and Injunctive Relief

the basis for this assumption. Although it authorized unconventional oil drilling techniques such as fracking, the FEIS failed to meaningfully analyze these activities' environmental impacts.

61.     On June 10, 2015, Plaintiffs Center for Biological Diversity and Los Padres ForestWatch filed a complaint for declaratory and injunctive relief challenging BLM's 2014 RMP and FEIS, arguing that the FEIS failed to analyze a meaningful range of alternatives and failed to adequately analyze the environmental impacts of the 2014 RMP, including impacts from fracking.

62.     On September 6, 2016, this Court held that BLM's FEIS failed to adequately analyze the impacts of fracking in the 2014 RMP, as NEPA requires.

63.     On May 3, 2017, the Court approved a settlement agreement in which the parties agreed to partial remand without vacatur of the record of decision adopting the 2014 RMP. BLM agreed to prepare supplemental NEPA documentation to address the deficiencies identified by the Court and to issue a new decision document to amend or supersede the existing record of decision. BLM also agreed that pending the issuance of the new decision document, it would not hold any oil or gas lease sales within the 2014 RMP decision area.

64.     On April 26, 2019, in response to the settlement agreement, BLM released a draft SEIS, thereby initiating a 45-day public comment period. BLM received approximately 16,000 written comments on the draft SEIS.

65.     The draft SEIS relied on the same reasonably foreseeable development scenario as the 2012 FEIS. Of the 100 to 400 new wells projected to be drilled in the decision area per year over the next ten years, the SEIS predicted that only 10 to 40 of those new wells will be on new leases. BLM further predicted that zero to four of these new wells on new leases will be fracked. BLM did not project the number of wells on existing leases that may be fracked.

66.     During the public comment period, Plaintiffs submitted comments on the draft SEIS. They identified critical flaws in the analyses and noted that the draft SEIS

still did not adequately analyze the environmental impacts that will result from fracking.

67.     Plaintiffs criticized BLM for relying on a reasonably foreseeable development scenario that did not address the likelihood that fracking will expand the scope and intensity of oil and gas activities, thereby expanding or intensifying surface disturbance impacts. They also noted that because the draft SEIS relied on an arbitrary and unsupported prediction of the number of wells to be fracked, and failed to analyze the impacts of fracking on existing federal leases, the draft SEIS underestimated the impacts to air quality, climate, water quantity and quality, human health and safety, recreational uses, national park units and other public lands, and seismicity, and failed entirely to evaluate the health effects of fracking on local communities.

68.     With respect to air quality, Plaintiffs noted that BLM's conclusion that emissions from fracked wells will be below *de minimis* threshold values relied on a faulty projection of the number of wells predicted to be fracked, failed to account for all the emissions sources in the fracking process, and did not include a proper analysis of direct, indirect, and cumulative impacts. Plaintiffs further pointed out that the draft SEIS failed to adequately disclose the chemicals that might be used in the fracking process, and the health impacts of those chemicals and other constituents and elements of the fracking process.

69.     Plaintiffs also expressed concerns that the draft SEIS did not adequately or accurately analyze and disclose the greenhouse gas emissions and related climate change impacts that will result from fracked wells on federal land or mineral estate in the Bakersfield planning area. Plaintiffs further noted the draft SEIS failed to consider the cumulative greenhouse gas impacts of conventional and fracked wells in the planning area.

70.     With respect to water quality, Plaintiffs explained that the draft SEIS underestimated the serious risks of groundwater contamination due to fracking or

Complaint for Declaratory and Injunctive Relief

other well stimulation techniques and from storage and disposal of fracking flowback and produced water.

71.     With respect to community impacts, Plaintiffs also expressed concerns that the draft SEIS did not even acknowledge that the communities within and around the planning area are already disproportionately impacted by pollution from industrial agriculture, heavy diesel truck traffic, and intensive oil and gas development in the region. Plaintiffs noted that increased fracking will only exacerbate these disproportionately high and adverse impacts to these "environmental justice" communities, but that the draft SEIS failed entirely to include discussion of health and environmental impacts in its analysis.

72.     With respect to geologic impacts, Plaintiffs identified myriad shortcomings in the draft SEIS and its inadequate analysis of induced seismicity associated with fracking and consequential oil and gas production activities such as waste fluid disposal. Plaintiffs noted that the draft SEIS failed to consider the increased risk posed by active faults in the region, and failed to disclose that fracking and consequential oil and gas production activities can induce larger earthquakes than previously thought.

73.     With respect to recreational impacts, Plaintiffs explained that areas made available for fracking are very close to private and public recreation sites, including national parks. Plaintiffs noted that fracked well pads create additional surface disturbance and greater disruption of visual resources and that increased development associated with fracking results in fewer visitors to recreation areas.

74.     On November 1, 2019, BLM announced the availability of the final SEIS. The final SEIS is substantively identical to the draft SEIS, and relies on the same reasonably foreseeable development scenario.

75.     BLM did not directly respond to Plaintiffs' concerns and, where it did respond, used repetitive, non-responsive boilerplate statements in its responses to comments in the final SEIS.

76.     On December 12, 2019, BLM issued its Record of Decision adopting the final SEIS and reaffirming the portions of the 2014 record of decision set aside in the partial remand. Because the SEIS concluded that the impacts from fracking would be negligible, BLM concluded the 2014 RMP will remain in effect without amendments.

## FIRST CLAIM FOR RELIEF

### (Violation of NEPA: Failure to Analyze Environmental Impacts)

77.     Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

78.     NEPA and its implementing regulations require that an EIS "provide full and fair discussion of significant environmental impacts." 40 C.F.R. § 1502.1. An EIS and SEIS must analyze the environmental impacts of the proposed action and alternatives, including direct effects, indirect effects, and cumulative effects. *Id*. §§ 1502.16, 1508.7, 1508.8, 1502.9(c)(4); 42 U.S.C. § 4332(C). To comply with NEPA, agencies must take a "hard look" at the potential environmental consequences of the proposed action. *Oregon Natural Res. Council Fund v. Brong*, 492 F.3d 1120, 1132 (9th Cir. 2007); *Lowe*, 109 F.3d at 528.

79.     The SEIS for the 2014 RMP fails to provide the requisite "full and fair discussion" of the direct, indirect, and cumulative impacts of fracking, including on:

        A.     air quality;

        B.     greenhouse gas emissions and the climate;

        C.     groundwater quantity and quality;

        D.     seismicity;

        E.     recreational uses;

        F.     national park units and other public lands;

        G.     human health and the environment; and

        H.     environmental justice communities.

80.     The failure of BLM's SEIS to disclose and adequately analyze the significant and adverse environmental impacts of fracking associated with the 2014

RMP is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, and contrary to the procedures required by law.

**SECOND CLAIM FOR RELIEF**

**(Violation of NEPA: Failure to Respond to Comments)**

81.　Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

82.　NEPA requires an agency preparing an EIS to assess and respond to comments "both individually and collectively," stating its response in the final EIS. 40 C.F.R. § 1503.4(a). Where BLM chooses not to make responsive changes to its proposed action, its response to comments must be made "objectively and in good faith." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011).

83.　BLM's SEIS failed to adequately respond to comments because BLM relied on repetitive, non-responsive statements that failed to address the substance of Plaintiffs' comments on the draft EIS instead of providing the requisite objective, good faith response.

84.　The failure of BLM's SEIS to adequately respond to comments on the shortcomings of the draft SEIS is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, and contrary to the procedures required by law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.　Find and declare that BLM adopted the SEIS and 2019 Record of Decision in violation of NEPA and related federal regulations;

B.　Set aside the SEIS and 2019 Record of Decision;

C.　Enjoin BLM from authorizing or otherwise proceeding with oil and gas leasing or other oil and gas activities pursuant to the 2014 RMP pending compliance with NEPA;

D.　Retain continuing jurisdiction of this matter until BLM fully remedies the violations of law complained of herein;

1    E.    Award qualified Plaintiffs their costs of litigation, including reasonable

2  attorneys' fees and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. §

3  2412; and

4    F.    Grant Plaintiffs such additional relief as the Court may deem just and

5  proper.

6                              Respectfully submitted,

7
   Dated:  January 14, 2020          /s/   Michelle Ghafar
8                              MICHELLE GHAFAR (CA Bar No. 315842)
9                              mghafar@earthjustice.org
                             Earthjustice
10                             50 California Street, Suite 500
                             San Francisco, CA 94111
11                             Tel: (415) 217-2000 / Fax: (415) 217-2040

12                             ELIZABETH B. FORSYTH (CA Bar No. 288311)
13                             eforsyth@earthjustice.org
                             Earthjustice
14                             707 Wilshire Street, Suite 4300
                             Los Angeles, CA 90017
15                             Tel: (213) 766-1067 / Fax: (415) 217-2040

16
17                             *Counsel for National Parks Conservation Association,*
                             *Natural Resources Defense Council, and The*
18                             *Wilderness Society*

19                             CLARE LAKEWOOD (CA Bar No. 298479)
20                             clakewood@biologicaldiversity.org
                             BRENDAN CUMMINGS (CA Bar No. 193952)
21                             bcummings@biologicaldiversity.org
                             Center for Biological Diversity
22                             1212 Broadway, Suite 800
                             Oakland, CA 94612
23                             Tel: (510) 844-7121 / Fax: (510) 844-7150

24
25                             *Counsel for Center for Biological Diversity, Central*
                             *California Environmental Justice Network, Los*
26                             *Padres ForestWatch, Patagonia Works, and Sierra*
                             *Club*

27

28

Complaint for Declaratory and Injunctive Relief